FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

FEB 24 2016

D. MARK JONES, CLERK
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAMES DOUGLAS HAYES,<br><br>Defendant. | REPORT AND RECOMMENDATIONS<br><br>CASE NO. 2:14-CR-00013-TS<br><br>Magistrate Judge Robert T. Braithwaite |

Before the Court is a Motion to Suppress Evidence submitted by defendant James Douglas Hayes. (Docket Entry No. 85) After consideration of the evidence, testimony, and pleadings, the Court recommends that defendant's Motion to Suppress Evidence be **DENIED**.

## BACKGROUND

On September 15, 2014, Mr. Hayes filed a motion to suppress in which he raised four claims. The first two claims centered on the initial traffic stop and associated detention of Mr. Hayes; the latter claims challenged the search of a travel trailer. The government conceded defendant's standing to as to his first two claims

1

but asserted a lack of standing as to the travel trailer. Following briefing by the parties, this Court found that Mr. Hayes lacked standing to challenge the search of the travel trailer (claims three and four) but ordered an evidentiary hearing as to the first two claims. On May 18, 2015, the Court held an evidentiary hearing on those remaining issues—the stop and detention of Mr. Hayes.

## FACTUAL BACKGROUND

On the evening of December 19, 2013, an employee of the Pilot gas station near Interstate 15, Exit 4, reported a male suspect attempting to pass counterfeit money. (Transcript of 5/18/2015 Evidentiary Hearing at 6-7.) The employee described the suspect as a white male, "scruffy looking, brown hair," seen in a white Chevy pickup with a green tarp in back. The suspect tried to make a purchase using several fake twenty dollar bills. (*Id.* at 8-9.)

St. George Police Officer Tyrell Bangerter[1] arrived first on scene and located the white Chevy pickup parked next to a gray Ford truck pulling a travel trailer. (*Id.* at 7-9.) The trucks were behind the gas station building in an area of the parking lot

---

[1] An eleven year veteran with St. George Police Department, Officer Bangerter has worked in the traffic unit for more than three years—his primary focus being insurance enforcement. In addition to traffic enforcement duties, Officer Bangerter also assists patrol officers. He completed a 40-hour training course in drug trafficking interdiction. (Transcript of 5/18/2015 Evidentiary Hearing at 6-7.)

2

lacking fuel pumps or other services. (*Id.* 9-10.) While waiting for additional officers to arrive, Officer Bangerter observed a group of people near the trucks. The group then separated—some getting into the white Chevy, some into the gray Ford—giving the appearance that the group was traveling together. (*Id.* at 10.)

The white Chevy then pulled around the front of the building and up to a gas pump. Officer Bangerter checked the truck's Arizona license plate and found the registration suspended for no insurance. (*Id.* at 10-11.) He made contact with the driver and explained that the registration had been suspended. (*Id.* at 11-12.) The driver, Monty Simpson, said he did not own the truck and did not know if it was currently insured. He indicated that the truck belonged to "Johnny," a friend who was traveling in the gray Ford truck that was preparing to exit the parking lot. (*Id.* at 12-13.) Mr. Simpson's clean-cut appearance and red hair was inconsistent with the counterfeiting suspect's description, and the only other occupant in the Chevy truck was a female, Julie Shapiro. (*Id.* at 13-14.)

Mr. Simpson's statements lacked information one typically knows about travel companions and destinations. For example, though Mr. Simpson claimed Johnny was a good friend, he did not know Johnny's last name. He did not know the people he was going to visit for Christmas or know where in Montana they lived, and Mr. Simpson seemed to have no idea how far Montana was from St. George. (*Id.* at

3

14-15.) Officer Bangerter also noted the white Chevy pickup's condition and appearance differed dramatically from that of the gray Ford truck, and he considered whether the Chevy might be a so-called "decoy vehicle" to draw law enforcement attention away from the Ford. (*Id.* at 16-17, 21.)

Shortly after contacting Mr. Simpson, dispatch advised Officer Bangerter that the gray Ford truck was also involved in the alleged counterfeiting incident. (*Id.* at 18, 31-33.) Based upon this information and his investigation to this point, Officer Bangerter then asked Officer Scott Cleveland (who was just arriving on scene) to contact the occupants in the gray Ford truck. (*Id.* at 18.) Officer Cleveland did so and, soon thereafter, told Officer Bangerter that one of the Ford's passengers claimed ownership of the white Chevy. (*Id.* at 18-19.)

Because Officer Cleveland was assigned as the primary officer on the counterfeiting call, Officer Bangerter proceeded with his investigation of the insurance violation on the white Chevy truck. (*Id.* at 19.) Additional officers arrived to assist, including Officer Lee and Sergeant Bahlmann. (*Id.* at 19-20.) Officer Lee stayed with Mr. Simpson and Ms. Shapiro while Officer Bangerter made contact with a woman identified as Felicia Montijo,[2] a passenger in the Ford and registered

---

[2] Ms. Montijo's last name is incorrectly spelled "Montego" in the evidentiary hearing transcript.

4

owner of the Chevy. (*Id.* at 20.) Ms. Montijo confirmed that her truck had been uninsured for several months. (*Id.*) Ms. Montijo said they were headed to Montana to visit friends but, like Mr. Simpson, did not know who the friends were. (*Id.*)

Officer Bangerter decided to impound the Chevy for no insurance and shared with the on-scene supervisor his suspicion that the Chevy was being used as a decoy vehicle. (*Id.* at 21.) Officer Lee informed Officer Bangerter that Mr. Simpson had at least one counterfeit bill in his possession. (*Id.* at 22.) Officer Bangerter then began a vehicle inventory as part of the impound process. Officer Bangerter located a purse, which Ms. Shapiro claimed to be hers, and in the purse were several counterfeit bills. (*Id.* at 24.) Officer Cleveland advised Officer Bangerter that he should find an envelope in the center console containing more counterfeit currency. (*Id.* at 23-24.) Officer Bangerter located the envelope of counterfeit bills as described, completed the vehicle inventory and impound, and turned over all seized counterfeit money to Officer Cleveland. (*Id.* at 25.)

Officer Cleveland proceeded to investigate the counterfeiting incident. He contacted the gas station employee who reported the crime. (*Id.* at 54.) The employee said the occupants of the white Chevy and gray Ford trucks had been together, parked at the station most of the day, and that a male in the group tried to use counterfeit bills after being in and out of the store several times. (*Id.* at 55.)

5

Officer Cleveland interviewed Mr. Simpson, who denied attempting to make any purchases in the store. Mr. Simpson also said the Chevy he had been driving belonged to "Johnny," who was traveling in the Ford. (*Id.* at 55-56.)

Officer Cleveland then spoke with "Johnny," a passenger in the Ford who identified himself as David Whaley. (*Id.* at 56-57.) Mr. Whaley admitted he had been in the store and that the clerk told him his money was counterfeit. Mr. Whaley stated he had already handed over the counterfeit bills to one of the assisting officers; the assisting officer then provided the bills to Officer Cleveland, who noted them to be of poor quality and obviously counterfeit. The bills lacked proper security features and had identical serial numbers. (*Id.* at 57-58, 60-61.)

Mr. Whaley claimed he received the counterfeit money from a man named David Hernandez as payment for a welding job. He stated that they met at the California/Nevada state line, where Hernandez gave him approximately $500 in cash for the welding work, though he claimed he never counted it. (*Id.* at 58-59.) Mr. Whaley said the rest of the money Hernandez gave him was in an envelope in the Chevy. (*Id.* at 59-60.) When asked about travel plans, Mr. Whaley stated that his brother had died and the group was headed to Montana for the funeral. He told Officer Cleveland that he had been staying in the travel trailer attached to the Ford truck and that he still had personal property inside the trailer. (*Id.* at 60.)

After learning counterfeit bills were found in Ms. Shapiro's purse, Officer Cleveland spoke with her. She said she was unaware that the money "Johnny" gave her was counterfeit. (*Id.* at 62.) She told Officer Cleveland that the group was going on vacation and denied there was any other purpose for the trip. (*Id.*) Ms. Shapiro said that all of her personal property was in the travel trailer and that she and Mr. Simpson were only driving the white Chevy because "Johnny" was too tired to drive. (*Id.* at 61-63.)

Officer Cleveland spoke again with Mr. Simpson, who volunteered that he had more bills in his possession that he suspected were counterfeit. Officer Cleveland collected the bills and noted they were obviously fake. (*Id.* at 63-64.) When questioned about the purpose of the trip, Mr. Simpson said the group was going to Montana for Christmas and added that he hoped to investigate a woman's paternity claim. (*Id.* at 64:16-24.) Mr. Simpson said that, like the others, his personal belongings were in the travel trailer. (*Id.* at 65.)

Officer Cleveland requested and received a driver license photo for David Whaley through dispatch. (*Id.* at 65.) The photo was obviously not the suspect claiming to be David Whaley. (*Id.* at 66.) Officer Cleveland confronted the suspect, who admitted lying about his name because he was on probation in California and not permitted to leave the state. (*Id.* at 66.) The suspect said his real name is Can

7

Whaley, that "Johnny" is his nickname, and that David Whaley is his brother. (*Id.* at 66-67.) Officer Cleveland confirmed Can Whaley's identity by driver license photo. (*Id.* at 67.)

Sergeant Jeff Bahlmann arrived at the Pilot station after several other officers were already on scene. He learned that the two trucks were traveling together and counterfeit currency had been recovered from one of them. (*Id.* at 39-40.) Sergeant Bahlmann contacted the driver of the gray Ford, defendant James Hayes, in an effort to determine whether that vehicle should be further detained. (*Id.* at 40.) Mr. Hayes denied any knowledge of the counterfeiting incident. (*Id.*) Mr. Hayes gave permission for Sergeant Bahlmann to search his truck and wallet. After verifying Mr. Hayes did not have counterfeit money in his wallet, Sergeant Bahlmann had the Ford's occupants exit and began to search the vehicle. (*Id.* at 41-42.) At no time during the search did Mr. Hayes object, withdraw consent, or ask Sergeant Bahlmann to stop searching. (*Id.* at 42-43.)

Sergeant Bahlmann found a small canister in a backpack on the floorboard. The canister contained small plastic baggies of suspected methamphetamine. (*Id.* at 43.) The backpack also contained paperwork with Felicia Montijo's name, so Sergeant Bahlmann questioned her about the canister. (*Id.* at 44.) Ms. Montijo, who had been a passenger in the gray Ford at the time of the stop, claimed ownership of

8

the backpack but denied knowing the canister—which she claimed was given to her by a friend to dispose of—contained drugs. (*Id.* at 44-45.) Sergeant Bahlmann arrested her for possession of methamphetamine. (*Id.* at 45.)

Sergeant Bahlmann then asked Mr. Hayes for permission to search the travel trailer for counterfeit currency. Mr. Hayes initially agreed but, before the search began, revoked his consent. (*Id.* at 46.) Having conferred with Sergeant Bahlmann, Officer Cleveland elected to apply for a search warrant for the travel trailer less than an hour after the initial stop. (*Id.* at 46-47, 70.) Inside the trailer, officers found a small amount of methamphetamine; a stolen 9mm caliber handgun; baggies, scales, and other drug paraphernalia; a printer, cloth-like paper, and more printed counterfeit currency bearing the same serial number as previously seized bills. Concealed in the rear bumper of the travel trailer, officers discovered multiple pounds of methamphetamine. (*Id.* at 68-69.)

## ANALYSIS

Defendant asserts that Officer Cleveland lacked reasonable suspicion to stop his vehicle and, alternatively, even if the initial stop were supported by reasonable

suspicion, officers unjustifiably exceeded the scope of the stop such that defendant's continued detention was unlawful.

Traffic stops constitute investigative detentions and qualify as seizures under the Fourth Amendment. *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995)(en banc). "To determine the reasonableness of an investigative detention, [courts] make a dual inquiry, asking first 'whether the officer's action was justified at its inception,' and second 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id. (quoting Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

I.   OFFICERS LAWFULLY STOPPED MR. HAYES.

An investigative detention is justified at its inception when a police officer has "a reasonable, articulable suspicion that the detainee has been, is, or is about to be engaged in criminal activity." *United States v. Nicholson,* 983 F.2d 983, 987 (10th Cir. 1993). "[A]n officer need not rule out the possibility of innocent conduct; he or she simply must possess some minimal level of objective justification for making the stop." *United States v. Winder,* 557 F.3d 1129, 1134 (10th Cir.2009)(quotations omitted). Indeed, "as long as [the officer] has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an

investigatory detention even if it is more likely than *not* that the individual is not involved in any illegality." *United States v. Johnson,* 364 F.3d 1185, 1194 (10th Cir. 2004)(emphasis in original).

Moreover, "[u]nder the collective knowledge doctrine, the officer who makes the stop need not have reasonable suspicion that criminal activity is afoot. Instead, the knowledge and reasonable suspicions of one officer can be imputed to another." *United States v. Whitley,* 680 F.3d 1227, 1234 (10th Cir. 2012)(*citing United States v. Chavez,* 534 F.3d 1338, 1345–46 (10th Cir.2008)). In other words, "an arrest or stop is justified when an officer having . . . reasonable suspicion instructs another officer to act, even without communicating all of the information necessary to justify the action." *Id.* (citation omitted). Because Officer Cleveland stopped defendant's vehicle at Officer Bangerter's instruction, information known to both officers is considered collectively in determining whether reasonable suspicion justified the stop.

Given the totality of the circumstances, officers had reasonable suspicion that occupants of the defendant's vehicle were, or had been, engaged in criminal activity:

*1. Citizen report.* Information from identifiable citizens is inherently more reliable than anonymous tips, particularly when the caller claims firsthand knowledge of criminal activity and provides specific details of the events and

11

suspects. *See United States v. Copening,* 506 F.3d 1241, 1246-47 (10th Cir. 2007). Officers responded to the Pilot station based on a counterfeiting complaint provided by an employee in the store. The employee claimed firsthand knowledge of an attempt to pass approximately $200 in counterfeit twenty dollar bills. The employee described the suspect as a white male, "scruffy looking, brown hair," seen in a white Chevy truck with a green tarp in the back. The caller also provided an Arizona license plate number for the white Chevy.

Officer Bangerter's initial observations corroborated the caller's details. He located a white Chevy truck with a green tarp behind the Pilot store, in an area of the parking lot void of fuel pumps or other services. As the truck pulled around front to the fuel pumps, Officer Bangerter confirmed its Arizona license plate number.

Shortly after Officer Bangerter made contact with the occupants of the white Chevy, the Pilot employee informed dispatch that a gray Ford truck pulling a travel trailer was also involved in the counterfeiting incident.

Officer Bangerter had previously observed the gray Ford parked near the white Chevy behind the store. A group of subjects were near the trucks, and soon after Officer Bangerter's arrival the group divided, some getting into the Chevy and others into the Ford. Thus, the location of the trucks and behavior of their occupants prior to police contact suggested that the Chevy and Ford were traveling together.

While this identifiable citizen's detailed, firsthand report—combined with an officer's corroborating observations—established reasonable suspicion, additional facts supported Officer Bangerter's request that Officer Cleveland stop the defendant's vehicle.

**2. *Suspect description.*** Upon initial contact, it was obvious that the driver of the white Chevy, Mr. Simpson, did not match the physical description of the counterfeiting suspect. Officer Bangerter quickly learned from Mr. Simpson, however, that the owner of the white Chevy was traveling in the defendant's gray Ford truck. Not only was this information consistent with Officer Bangerter's observations and the citizen report of the gray Ford's involvement, but it also provided reasonable suspicion that the counterfeiting suspect was in defendant's vehicle.

**3. *Insurance violation.*** Prior to contacting the driver of the white Chevy, Officer Bangerter discovered that the vehicle's registration was suspended for lack of insurance—an offense for which the vehicle's owner (in the gray Ford at that time) can be cited. This additional violation provided independent reasonable suspicion justifying a stop of the gray Ford truck.

Officer Bangerter merely needed "some minimal level of objective justification for [requesting] the stop." *United States v. Winder*, 557 F.3d 1129, 1134

13

(10th Cir.2009). This is particularly true when, as was the case here, the officer's observations combined with an identifiable citizen's firsthand report that subjects were involved in criminal activity. Officer Bangerter's knowledge and suspicions "can be imputed" to other officers; Officer Bangerter was not required to first "communicat[e] all of the information necessary to justify the action" by Officer Cleveland. *United States v. Whitley,* 680 F.3d 1227, 1234 (10th Cir. 2012)(citation omitted). There was nothing unreasonable—or unconstitutional—about the officers' decision to briefly detain defendant to investigate whether he or his passengers had been involved in criminal activity reportedly occurring just minutes earlier at that location.

## II. OFFICERS DID NOT UNLAWFULLY EXCEED THE SCOPE OF DEFENDANT'S DETENTION.

The second prong of the investigative detention analysis asks "whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, 20 (1968).

As explained by the Tenth Circuit,

> An investigative detention usually must last no longer than necessary to effectuate the purpose of the stop. An investigative detention may be expanded beyond its original purpose, however, if during the initial stop the detaining officer acquires "reasonable suspicion," of criminal activity, that is

14

> to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity.

*United States v. Villa-Chaparro,* 115 F.3d 797, 801-02 (10th Cir. 1997)(citations and quotations omitted). And, in assessing reasonable suspicion, the Court must base decisions not on any one factor, but on the "totality of the circumstances." *United States v. Jones,* 44 F.3d 860, 872 (10th Cir. 1995).

Promptly after stopping defendant's truck, Officer Cleveland began investigating the counterfeit currency complaint. In the first fifteen minutes or so, Officer Cleveland had met with the store employee, spoken with Mr. Simpson, and made contact with Mr. Whaley. While Mr. Whaley promptly acknowledged being in the store and being told by the clerk that his money was counterfeit, this information did not conclude the investigation or render further detention of Mr. Hayes unreasonable.

Officer Bangerter's suspicions of criminal activity increased—rather than dissipated—as he spoke with the driver of the white Chevy. Mr. Simpson said the Chevy's owner, "Johnny," had been his friend forever but could not give Johnny's last name; Mr. Simpson did not know the people in Montana they were going to visit; he did not know where in Montana those people lived; and, at around 7:00pm in St. George, Mr. Simpson said they planned to arrive to Montana that evening, despite being much further than five hours from the Idaho/Montana border. Based

15

on his training and the totality of the circumstances, Officer Bangerter began to suspect that the white Chevy was acting as a decoy vehicle to draw attention away from the gray Ford, and he later relayed those suspicions to the supervisor.

Collectively, officers observed numerous indications that the group of travelers, including Mr. Hayes, was engaged in criminal activity. The suspects appeared to be sharing vehicles, a travel trailer, and counterfeit bills with identical serial numbers; the suspects provided clearly contradictory statements about the basic purpose of their trip; at least one suspect (an occupant of defendant's truck) lied about his identity to conceal his probation status; and suspected methamphetamine was discovered in the passenger compartment of defendant's vehicle.

Officers stopped Mr. Hayes on suspicion that he (or one of his passengers) was involved in attempting to use counterfeit money at the Pilot gas station. Officers promptly confirmed that to be the case, as several members of the group had counterfeit bills. The conflicting answers to basic questions about travel plans, false personal information, and the discovery of methamphetamine in defendant's truck increased, rather than alleviated, suspicions of additional criminal activity—suspicions that implicated the entire group, not just Mr. Whaley.

As the driver of the truck towing a travel trailer likely to contain evidence of criminal activity, defendant's continued detention was reasonable under the

circumstances. Without delay, officers sought, obtained, and executed a search warrant on the travel trailer. The evidence before the Court establishes that officers detained Mr. Hayes "no longer than necessary to effectuate the purpose of the stop," *United States v. Villa-Chaparro,* 115 F.3d 797, 801-02 (10th Cir. 1997), and that their investigation "was reasonably related in scope to the circumstances which justified the interference in the first place," *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995)(en banc)(quotations omitted), despite the fact that the investigation quickly—and justifiably—expanded beyond Mr. Whaley's attempt to pass counterfeit bills.

## RECOMMENDATION

Based on the foregoing analysis, **IT IS HEREBY RECOMMENDED** that defendant's Motion to Suppress Evidence, (Docket Entry no. 85), be **DENIED.**

Copies of the foregoing report and recommendation are being mailed to the parties who are hereby noticed of their right to object to the same. The parties are further notified that they must file any objections to the report and recommendation, with the clerk of the district court, pursuant to 28 U.S.C. Section 636(b), within fourteen (14) days after receiving it. Failure to file objections to both factual and

legal findings may constitute a waiver of those objections on subsequent appellate review.

DATED this 24 day of February, 2016.

ROBERT T. BRAITHWAITE
United States Magistrate Judge